## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J&B MEDICAL SUPPLY CO., INC.,

       Plaintiff,

v.

CENTERS FOR MEDICARE & MEDICAID
SERVICES; and NOVITAS SOLUTIONS,
INC., as Medicare Administrative Contractor
with the Centers for Medicare & Medicaid
Services,

       Defendants.

Case No. 1:25-cv-_____

**EXPEDITED CONSIDERATION
REQUESTED**

**PRELIMINARY RELIEF SOUGHT BY
<u>SEPTEMBER 16, 2025</u>**

---

Gregory L. Ewing (Bar No. 484684)
DICKINSON WRIGHT PLLC
International Square
1825 Eye Street N.W., Suite 900
Washington, D.C. 20006
202-457-0160
GEwing@dickinsonwight.com
*Attorney for Plaintiff*

---

### PLAINTIFF'S *EX PARTE* EMERGENCY APPLICATION FOR TEMPORARY
### <u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Civil Rule 65.1 of

the United States District Court for the District of Columbia, Plaintiff J&B Medical Supply Co.,

Inc. ("J&B"), applies for an *ex parte* temporary restraining order ("TRO"), followed by a

preliminary injunction, compelling Defendants Centers for Medicare & Medicaid Services

("CMS") and Novitas Solutions, Inc., as Medicare Administrative Contractor with CMS,

("Novitas"), (together, "Defendants"), to stay their September 17, 2025 revocation of J&B's

Medicare supplier enrollment until after the Defendants afford to J&B its due process as required

by the United States Constitution.

J&B seeks injunctive relief because: (1) J&B will likely succeed on the merits of its deprivation-of-due-process-claim; (2) J&B will be irreparably harmed if it does not receive relief before September 17, 2025; (3) the equities favor granting J&B's requested relief; and (4) granting J&B's requested relief is in the public interest. J&B has no adequate remedy at law.

In support of its Application, J&B relies on the facts, argument, and case law contained in the accompanying Brief in Support of this Application. Pursuant to Local Civil Rule 7(c), J&B attaches a proposed order. **Exhibit 1**. J&B also attaches the sworn declaration of Julian Shaya, which attests to the truth of J&B's allegations. **Exhibit 2**.

Pursuant to Local Civil Rule 65.1(a), undersigned counsel hereby certifies that on September 10, 2025 at 10:10 p.m. EST, counsel for J&B provided to Robert Foster, Acting General Counsel for the Department of Health and Human Services, the agency in which CMS exists at Robert.Foster@hhs.gov; Novitas's executive team (Attn: NPEAST DMEPOS Legal Department) at communications@guidewellsource.com; and the contact provided in Novitas's revocation letter, Chags Health Information Technology LLC ("Chags") (PEARC@c-hit.com), notice at the time of making this Application and copies of all pleadings and papers filed in this action to date. **Exhibit 3**, Notice to Defs. Representatives for Defendants have not yet responded. Given the emergent nature of this Application, J&B requests that the Court consider this Application *ex parte*.

WHEREFORE, for the foregoing reasons and reasons stated in the accompanying Brief, together with the Complaint and its exhibits in support thereof, J&B respectfully requests that this Court enter a TRO restraining Defendants from revoking J&B's Medicare property rights until a preliminary injunction can be entered. J&B also requests that this Court require the Defendants to appear at a hearing and show good cause as to why injunctive relief should not be granted. J&B

respectfully requests the hearing on its Application no later than Tuesday, September 16, 2025, because irreparable harm will occur on Wednesday, September 17, 2025, the effective date of revocation.

Respectfully submitted,

DICKINSON WRIGHT PLLC

Dated: September 10, 2025

/s/ Gregory L. Ewing
Gregory L. Ewing (Bar No. 484684)
International Square
1825 Eye Street N.W., Suite 900
Washington, D.C. 20006
202-457-0160
GEwing@dickinsonwight.com
*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

J&B MEDICAL SUPPLY CO., INC.,

        Plaintiff,

v.

CENTERS FOR MEDICARE & MEDICAID
SERVICES; and NOVITAS SOLUTIONS,
INC., as Medicare Administrative Contractor
with the Centers for Medicare & Medicaid
Services,

        Defendants.

Case No. 1:25-cv-_____

**EXPEDITED CONSIDERATION
REQUESTED**

**PRELIMINARY RELIEF SOUGHT BY
<u>SEPTEMBER 16, 2025</u>**

---

Gregory L. Ewing (Bar No. 484684)
DICKINSON WRIGHT PLLC
International Square
1825 Eye Street N.W., Suite 900
Washington, D.C. 20006
202-457-0160
GEwing@dickinsonwight.com
*Attorney for Plaintiff*

---

### PLAINTIFF'S BRIEF IN SUPPORT OF ITS *EX PARTE* EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. I

TABLE OF AUTHORITIES ..................................................................................... II

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND ............................................................................................ 2

    A.    J&B Supplies Indispensable Medical Equipment for Entire State Populations ........................................................................................... 2

    B.    Novitas Revokes J&B's Medicare Enrollment .......................................... 4

    C.    The Catastrophic Effects of Revoking J&B's Medicare Enrollment ....................... 6

    D.    J&B Seeks to Prevent Its Demise and Protect Its Beneficiaries ............................. 8

III.    LEGAL STANDARD ..................................................................................... 9

IV.    ARGUMENT ............................................................................................... 9

    A.    J&B is Likely to Succeed on the Merits ................................................. 9

        1.    The present action is "wholly collateral" to the ongoing administrative appeal. ................................................................. 9

        2.    J&B will not have received due process prior to Defendants depriving J&B of its property interest in continuing enrollment as a Medicare supplier ..................................................................... 11

    B.    Irreparable Injury to J&B is Imminent .................................................. 15

    C.    The Balance of Equities and Public Interest Factors Weigh in Favor of J&B ................................................................................................. 18

V.    CONCLUSION ............................................................................................ 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Armstrong v. Manzo*, 380 U.S. 545 (1965) .................................................................. 13

*\*Arriva Med. LLC v. United States Dep't of Health & Hum. Servs.*, 239 F. Supp. 3d 266 (D.D.C. 2017) ...................................................................................................... passim

*Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277 (D.D.C. 2018) ................... 17

*Boddie v. Connecticut*, 401 U.S. 371 (1971) ................................................................ 13

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ....... 15

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C.Cir.1995) .......... 9

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ........................................ 12

*D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016) .............................................................. 11

*Davis v. District of Columbia*, 158 F.3d 1342 (D.C. Cir. 1998) ................................... 16

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................ 16

*Freeman v. FDIC*, 56 F.3d 1394 (D.C. Cir. 1995) ....................................................... 12

*Fuentes v. Shevin*, 407 U.S. 67 (1972) .......................................................................... 12

*Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142 (D.D.C. 1993) ................................ 19

*Gordon v. Holder,* 826 F. Supp. 2d 279 (D.D.C. 2011) ................................................ 15

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ................................................. 12

*Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174 (D.D.C. 2021) ................ 17

*\*Mathews v. Eldridge*, 424 U.S. 319 (1976) .............................................................. passim

*Mediplex of Mass., Inc. v. Shalala*, 39 F. Supp. 2d 88 (D. Mass. 1999) ..................... 18

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ................................ 9, 16

*Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) ....................... 16

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) .......................... 12, 13

*Nken v. Holder,* 556 U.S. 418 (2009) ............................................................................ 18

*Peak Med. Okla. No. 5, Inc. v. Sebelius*, No. 10-cv-5972010, WL 4809319 (N.D. Okla. Nov. 18, 2010) ........................................................................................................ 18

*Propert v. District of Columbia*, 948 F.2d 1327 (D.C. Cir. 1991) ................................. 13

*Ram v. Heckler*, 792 F.2d 444 (4th Cir. 1986) ............................................................. 12

*Robie v. Price*, No. 17-cv-03089, 2017 WL 3188572 (S.D.W. Va. July 26, 2017) ........... passim

*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368 (Fed. Cir. 2006) ............................. 17

*Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) ............................................... 9

*Thompson v. District of Columbia*, 832 F.3d 339 (D.C. Cir. 2016) .............................. 12

*UDC Chairs Chapter v. Bd. of Trs. of the Univ. of D.C.*, 56 F.3d 1469 (D.C. Cir. 1995) .......... 12

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................ 18

*Wisc. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ................................................ 15

*Wolff v. McDonnell*, 418 U.S. 539 (1974) .................................................................. 13

**Regulations**

42 CFR § 424.535(a)(1) .................................................................................................. 1

> *"It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law."*
>
> *~ Justice William O. Douglas, 1951*

## I.    INTRODUCTION

Plaintiff J&B Medical Supply Co., Inc.'s ("J&B") due-process rights have been violated, and it needs this Court's immediate intervention to prevent irreversible health injuries to the members it serves, as well as imminent and irreparable economic and reputational injury that will result in the end of its 29-year business.

This action is about the failure of Defendants Centers for Medicare & Medicaid Services ("CMS") and Novitas Solutions, Inc. ("Novitas"), as the Medicare Administrative Contractor with CMS (together, "Defendants"), to provide to J&B due process under the Fifth Amendment to the United States Constitution because—next week—Defendants will revoke J&B's Medicare supplier enrollment under 42 CFR § 424.535(a)(1) before providing to J&B *any* hearing.

In its August 18, 2025 revocation letter to J&B, CMS, through Novitas, provided to J&B inadequate notice of alleged violations. Now, Defendants provide to J&B inadequate pre-revocation process. Defendants informed J&B that it may submit both a corrective action plan ("CAP") and a request for reconsideration. The procedural problem, however, is that—regardless of J&B submitting its CAP and reconsideration request well within their respective 35-day and 65-day limits—the effective date of revocation remains September 17, 2025. Despite J&B's due-process right to be heard prior to the revocation, Defendants have not stayed revocation nor have they formally responded to J&B's CAP or reconsideration request. Thus, as things stand, J&B faces the immediate loss of its Medicare supplier enrollment—which will cause irreversible health injuries to the members it serves and effectively kill its business—before *any* hearing.

J&B does *not* ask this Court to address any substantive issues that are the subject of the administrative appeal with Defendants. J&B already submitted a CAP and reconsideration request to Chags Health Information Technology LLC ("Chags") as prescribed by Defendants' own appeals process to address the substantive issues. That administrative appeal will take its own course, and J&B is confident it will prevail. Nevertheless, *this case* is about the "wholly collateral" issue of whether J&B received due process—it did not—before Defendants take J&B's "property interest" in its Medicare supplier enrollment. Absent this Court's intervention, on September 17, 2025, J&B's enrollment will be revoked notwithstanding its administrative appeal. And there is no set timeline for the administrative process to resolve. The most crucial fact is that J&B's Medicare enrollment will be revoked, with all the consequential and irreversible injury that follows, before J&B has any opportunity to be heard.

Accordingly, J&B respectfully requests this Court to prevent this unnecessary, catastrophic, and punitive harm by imposing a temporary restraining order ("TRO") to maintain the status quo (i.e., J&B's enrollment status as a Medicare supplier in good standing) until Defendants afford to J&B its due process. As demonstrated below, J&B establishes each factor to support an injunction.

## II.    BACKGROUND

### A.    J&B Supplies Indispensable Medical Equipment for Entire State Populations

J&B is a Michigan-based, family-owned-and-operated supplier of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS"). **Exhibit 2**, J. Shaya Decl, ¶¶ 4–5. J&B employs approximately 500 people (not including additional 1099 contracts) in the States of Michigan (304 employees), Indiana, Florida, Missouri, Texas, North Carolina, Alabama, Arkansas, Connecticut, Georgia, Illinois, Kansas, Kentucky, Maryland, Louisiana, Mississippi, New Jersey, Ohio, Rhode Island, South Carolina, Tennessee, Wisconsin, South Dakota, and

California.  *Id.* ¶ 5.  Those job positions include nurses, billers, customer service representatives, warehouse personnel, purchasers, and administrative support.  *Id.* J&B has been enrolled with Medicare for over 20 years.  *Id.* ¶ 6.  In those 20 years, J&B has never received a determination of noncompliance.  *Id.*

As a Medicare DMEPOS supplier, J&B supplies 625 discrete disposable products to beneficiaries in almost every State.  *Id.* ¶ 7.  J&B's products include but are not limited to products for incontinence, urology, wound care, ostomy, COVID-19 test kits, breast pumps, batteries, ostomy, and diabetes.  *Id.* Some of J&B's products, such as its diabetic (insulin pumps and glucose monitors) and enteral equipment are considered "lifesaving" products.  *Id.* ¶¶ 7, 21.  In 2024, J&B provided diabetic supplies to 45,791 unique patients.  *Id.* ¶ 13.  In 2025, through September 10, 2025, J&B provided diabetic supplies to 33,811 unique patients.  *Id.* J&B services approximately 65,000 members *per month* with many receiving lifesaving therapies through exclusive arrangements with J&B.  *Id.* ¶ 8.

For example, for State Medicaid Fee For Service ("FFS") members who are both Medicaid and Medicare eligible, J&B has sole-source arrangements with Michigan (since 2004) and Wisconsin (since 2006) to exclusively service FFS members with incontinence and urological supplies.  *Id.* ¶ 9.  J&B is also one of only two suppliers in Indiana contracted to service incontinence supplies to FFS members.  *Id.* J&B cannot supply these incontinence and urological products to Michigan, Wisconsin, and Indiana without its Medicare enrollment.  *Id.* ¶ 10. Moreover, J&B is one of only a few DMEPOS providers of incontinence and urological supplies across the entire country, and J&B's incontinence supplies are vital for their users.  For example, if people do not receive catheters they cannot safely urinate.  *Id.* Indeed, the Office of Inspector General has recognized Michigan's incontinence program as exceptional for reducing costs, fraud,

waste, and abuse and improving care and member outcomes, which is a direct result of J&B.  *See id.* ¶ 11 (citing **Exhibit 2-A**, OIG Report).

The primary source of value for J&B is its 746 payor contracts, comprising at least 80% of J&B's business (the "Payor Contracts").  *Id.* ¶ 14.  Per the terms and conditions of *all* Payor Contracts, i.e., Medicaid, Medicare, Exchange, and Commercial, the contracts terminate upon a revocation of Medicare enrollment.  *Id.*  (citing **Exhibit 2-B**, Exemplar Payor Contract, §§ 5.5, 5.7, 6.1, and 9.2).  J&B also has sole-source arrangements with health plans for incontinence and urological supplies.  *Id.*  ¶ 15.

**B.    Novitas Revokes J&B's Medicare Enrollment**

On August 6, 2025, a representative from Novitas, on behalf of CMS, conducted an onsite audit at J&B's location in Wixom, Michigan as part of J&B's revalidation application.  *Id.* ¶ 16.  During the site visit, which spanned approximately a mere two hours, the Novitas representative did not request any documents, did not ask any questions relative to beneficiary access at the location, and did not inquire whether J&B maintains contracts to service its rental equipment.  *Id.* ¶ 17.

After that brief, single visit, Novitas issued to J&B a letter on August 18, 2025, revoking J&B's Medicare supplier number, Medicare enrollment, and Medicare billing privileges, effective in 30 days (September 17, 2025) (the "Revocation Letter" or simply "Letter")).  (Compl., Ex. A.)  J&B received the Letter on August 21, 2025.  (*Id.*); **Ex. 2**, J. Shaya Decl, ¶ 18.  As cause for the revocation, Novitas alleged that: (1) J&B's "facility is not normally visited by beneficiaries" and (2) J&B does not maintain contracts to service or repair rental equipment.[1]  (Compl., Ex. A,

---

[1] J&B does not ask this Court to address the underlying merits of Defendants' decision to revoke. Nevertheless, strictly for this Court's awareness of the underlying context, Defendants' two allegations of non-compliance against J&B are baseless: (1) whether beneficiaries "normally visit" J&B's facility is not a criteria for compliance, and even if it was, beneficiaries do visit J&B's

Revocation Letter.)  The Letter did not notify J&B of any regulation requiring it to maintain a facility that is "normally visited by beneficiaries."  (*See id.*)  Novitas's Letter also informed J&B that it could submit a CAP within 35 days (September 22, 2025) and request a reconsideration of the decision within 65 days (October 22, 2025).  (*Id.*)  The Letter instructed J&B to submit its CAP and reconsideration request to Chags (PEARC@c-hit.com).  (*Id.*)  The Letter did not provide any timeframe for someone from Chags, Novitas, or CMS to respond to the CAP or reconsideration request.  (*See id.*)  Upon J&B's own research, CMS's recommended form for submitting a CAP or reconsideration request states that a decision on a CAP will be made within 60 days and a decision on a reconsideration request within 90 days.  (Compl., Ex. D, CMS Form.)

For reasons unknown, despite the revocation not taking effect until September 17, 2025, the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS") website already lists J&B's Medicare enrollment status as "REVOKED":

| **Contractor:** NOVITAS DME |
| **State:** MICHIGAN |
| **Type/Specialty:** MEDICAL SUPPLY COMPANY |
| **Enrollment Type:** 855S |
| **Medicare ID:** 4981690001    View Medicare ID Report |
| **Status:** REVOKED    View Revoked Enrollment Record |
| **Revocation Reason:** |
| 424.535(a)(1) NONCOMPLIANCE (DME STANDARDS NOT MET) |
| **Revocation Date:** 09/17/2025 |

| Type of Up date | Status | Tracking ID | Action |
|---|---|---|---|
| Revalidatio n | REJECTED/WITHDRA WN  View Rejected/Wit hdrawn Application | T0709202500047 61 | CORRECT & RE-SUBMIT ▶ <br> WITHDRAW ▶ |

---

facility; and (2) for the only rental equipment J&B provides, i.e., insulin pumps, J&B's policy dictates that any necessary repair or replacement of the insulin pumps will be provided at no cost to the beneficiary for the duration of the pump's reasonable useful lifetime.  (*See* Compl., Ex. B, CAP.)  Moreover, J&B supplies only four to six insulin pumps per year and, in the last 20 months, received a meager total of $5,799.53 from Medicare for the pumps.  **Ex. 2**, J. Shaya Decl., ¶ 12.

*See*        Medicare        Enrollment        for        Providers        &        Suppliers,

https://pecos.cms.hhs.gov/pecos/login.do#headingLv1  (last visited Sept. 9, 2025).

**C.    The Catastrophic Effects of Revoking J&B's Medicare Enrollment**

Revocation will cause devastating injuries to J&B's members.  J&B services approximately 65,000 members per month with many receiving lifesaving therapies through exclusive arrangements with J&B.  **Ex. 2**, J. Shaya Decl., ¶ 8.  When revocation occurs, the State and Payor Contracts will terminate if J&B is not enrolled in Medicare, and J&B will no longer service the health plans' or States' members, which in turn means the members must transition to a different supplier, which is an arduous process because of the voluminous documentation and logistics that must be exchanged between the new supplier and (1) J&B, (2) the prescribing provider (primary care physician or specialist), and (3) the health plan and/or State.  *Id.* ¶¶ 14, 19. Onboarding new members with DMEPOS needs could take up to 45 days.  *Id.* ¶ 20.  Thus, those members will go without necessary medical supplies for an extended period, risking serious health injuries, including death.  *Id.*  J&B cannot supply any products without Medicare enrollment, including lifesaving products like enteral or diabetes equipment.  *Id.* ¶ 21.  This also means that J&B cannot supply incontinence supplies, so members in Michigan and Wisconsin will be without any incontinence supplies, and members in Indiana will be left with only one possible supplier. *Id.*  Revocation will result in serious medical issues and costs for the public.

Revocation also means the end of J&B.  J&B's central source of value, its Payor Contracts, are contingent upon J&B's status as a Medicare supplier.  *Id.* ¶ 14.  If Defendants revoke J&B's Medicare enrollment, its 746 Payor Contracts terminate.  *Id.*  A termination of the State and Payor Contracts means a complete loss of J&B's entire insurance line of business, which is at least 80% of J&B's current business.  *Id.* ¶ 22.  J&B's Payor Contracts are highly coveted in the industry and, if revoked, would be "impossible" to renew not only because of the highly competitive nature

of obtaining such contracts in the current market, but also because those contracts were entered into based upon the relationships and circumstances at the time of execution. *Id.* ¶ 23. Moreover, even if J&B could renew its 746 Payor Contracts on the exact same terms (it cannot), J&B could never regain the same members it currently services under those contracts. *Id.* ¶ 24. Essentially, revocation will immediately destroy J&B's 29-year labor of building out its network for these contracts. *Id.* ¶ 25. What took more than 20 years to establish across the country will be gone, and J&B will be forced to start over. *Id.*

Revocation not only means the end of J&B's current health care contracts, but also the elimination of prospective business. Opportunities in J&B's pipeline dependent on J&B's Medicare enrollment will disappear, including any sole-source arrangements with health plans for diabetes or incontinence supplies. *Id.* ¶ 26. J&B also has a rebid pending in Indiana for its current business, which it must rescind if it loses Medicare enrollment. *Id.* ¶ 27. But most importantly in the context of prospective business, a revocation of Medicare enrollment for alleged non-compliance, and resulting cancelation of J&B's State and Payor Contracts, will tarnish J&B's 29-year reputation of good standing in the health care industry, which will destroy J&B's business. *Id.* ¶ 28. And even when the administrative appeals process vindicates J&B, such reputational damage can never be entirely undone.

As a result of losing its entire insurance line of business (at least 80% of J&B's business), J&B will be forced to lay off at least 400 (80%) of its nearly 500 employees because such employees would have no work absent J&B's insurance business, i.e., the employees would be unable to process orders, bill, perform assessments with members, speak with beneficiaries, or check eligibility—there would be no work to perform. *Id.* ¶ 29. Many of those employees have

been employed by J&B for five or more years and possess irreplaceable, institutional knowledge of J&B that cannot be replicated, meaning J&B cannot survive revocation.  *Id.*

### D.    J&B Seeks to Prevent Its Demise and Protect Its Beneficiaries

Given CMS's draconian penalty set to take effect in just 27 days from the date J&B received the Revocation Letter, J&B moved expeditiously to submit its CAP and reconsideration request to halt the revocation and subsequent injuries to the public and demise of the company.

On August 28, 2025, J&B submitted its CAP to Chags as instructed.  (Compl., Ex. B, CAP.) In the CAP, J&B requested "that th[e] matter be reviewed immediately and the revocation be overturned" and "that any action be stayed until the CAP is reviewed."  (*Id.* at 1.)  The CAP stressed the emergent situation: "The future of the company is at stake." (*Id.* at 4.)  On September 3, 2025, J&B submitted a supplement to its original CAP.  (*See* Compl., Ex. C, Supplemental CAP (enclosing an exemplar contract with an insulin pump manufacturer to rebut Novitas's non-compliance allegation).)  Again, J&B requested that Chags immediately review the CAP because the "future of the company is at stake."  (*Id.* at 2.)

Per Novitas's Revocation Letter, the reconsideration request is J&B's "only opportunity to submit information during the administrative appeals process unless an ALJ allows additional information to be submitted."  (Compl., Ex. A, Revocation Letter at 5.)  Accordingly, J&B took more time to finalize its reconsideration request relative to its CAP, to ensure it establishes a proper record.  Despite having until October 22, 2025, J&B submitted its reconsideration request on September 10, 2025, swiftly seeking to prevent the impending September 17 revocation.  (*See* Compl., Ex. E, Reconsideration Request.)

Defendants have yet to respond to J&B's CAP or reconsideration request, meaning J&B's Medicare enrollment will be revoked in mere days without a hearing.  Therefore, J&B needs an

immediate TRO from this Court to prevent an imminent procedural due process deprivation with catastrophic consequences.

### III.    LEGAL STANDARD

"The default rule is that a plaintiff seeking a preliminary injunction must make a clear showing that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). "A district court must balance the strength of a plaintiff's arguments in each of the four elements when deciding whether to grant a preliminary injunction." *Mills v. District of Columbia.*, 571 F.3d 1304, 1308 (D.C. Cir. 2009) (reversing denial of preliminary injunction). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir.1995)).

### IV.    ARGUMENT

**A.    J&B is Likely to Succeed on the Merits**

J&B brings a single cause of action under the Due Process Clause of the Fifth Amendment of the United States Constitution to prevent a deprivation of due process. (Compl., Doc. 1.)

**1.    *The present action is "wholly collateral" to the ongoing administrative appeal.***

As a threshold issue, even though J&B has not exhausted Defendants' appeals process, this Court has jurisdiction to hear this dispute because the "wholly collateral" exception to exhausting administrative remedies applies to a "plaintiff's claim to a predeprivation hearing as a matter of constitutional right that rests on the proposition that <u>full</u> relief cannot be obtained at a postdeprivation hearing." *Arriva Med. LLC v. United States Dep't of Health & Hum. Servs.*, 239 F. Supp. 3d 266, 278 (D.D.C. 2017) (Boasberg, C.J.,) (original emphasis) (quoting *Mathews v.*

*Eldridge*, 424 U.S. 319, 331 (1976)) (cleaned up); *see also Robie v. Price*, No. 17-cv-03089, 2017 WL 3188572, at *4 (S.D.W. Va. July 26, 2017) (holding that Medicare provider's "procedural due process claim is a constitutional claim that is *entirely collateral* to the substantive merits underlying the agency determination" to revoke the provider's billing privileges). As here, a plaintiff "is permitted judicial review when he (1) asserts a procedural challenge to the Secretary's denial of a pretermination hearing that is wholly 'collateral' to his claim for benefits and (2) makes a colorable showing that his injury could not be remedied by the retroactive payment of benefits after exhaustion of his administrative remedies." *Arriva*, 239 F. Supp. 3d at 278–79 (cleaned up).

As to the first prong, "[f]or a cause of action to be entirely collateral, it must not be the vehicle by which the plaintiff seeks to reverse the agency decision . . . or seeks an ultimate award of the benefits denied it by the agency." *Id.* at 279 (citation omitted). In *Arriva*, Judge Boasberg held that a plaintiff's "due-process challenge . . . that further pre-deprivation safeguards must obtain before CMS revokes a supplier's billing privileges" is "wholly collateral." *Id.* Here, J&B does not seek in this case to reverse Novitas's (CMS's) decision. J&B seeks reversal only through its CAP and separate request for reconsideration. J&B's singular challenge in *this case* is that additional pre-revocation safeguards are necessary before Defendants revoke J&B's Medicare supplier enrollment.

As to the second prong, a "colorable showing" that retroactive payment of benefits would not suffice is "lenient" and a "low bar," requiring only that a plaintiff's "showing of irreparable harm must not be wholly insubstantial and frivolous," i.e., citing to "<u>any</u> harm that it would suffer." *Id.* at 280 (original emphasis) (citation omitted). Judge Boasberg found that the plaintiff in *Arriva* met this low bar where the revocation would cause: (1) the plaintiff's customers to flee; (2) the plaintiff to go out of business; and (3) Medicare beneficiaries to bear the risks. *See id.* Here, and

as explained more fully herein concerning imminent irreparable injury, like *Arriva*, J&B will likely lose valuable contracts, close business, and, critically, leave vulnerable beneficiaries without essential care if J&B only receives post-revocation process.  *See* Section IV.B *infra*.

In short, J&B satisfies the two prongs.  The "wholly collateral" exception permits the Court to hear this action.

### 2.  *J&B will not have received due process prior to Defendants depriving J&B of its property interest in continuing enrollment as a Medicare supplier.*

The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V.  The Due Process Clause "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause."  *D.B. v. Cardall*, 826 F.3d 721, 741–42 (4th Cir. 2016) (citing *Mathews*, 424 U.S. at 332).

The process "due" under the Fifth Amendment depends on the situation: "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)); *see also Mathews*, 424 U.S. at 334 (Due process "is flexible and calls for such procedural protections as the particular situation demands.").  Its purpose "is not only to ensure abstract fair play to the individual," but "to minimize substantively unfair or mistaken deprivations."  *Freeman v. FDIC*, 56 F.3d 1394, 1403 (D.C. Cir. 1995) (quoting *Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972)).

A "familiar two-part inquiry" applies to procedural-due-process claims.  *UDC Chairs Chapter v. Bd. of Trs. of the Univ. of D.C.*, 56 F.3d 1469, 1471 (D.C. Cir. 1995) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)).  The Court "must [1] determine whether

[J&B] was deprived of a protected interest, and, [2] if so, whether [J&B] received the process to which [it] was entitled." *Thompson v. District of Columbia*, 832 F.3d 339, 344 (D.C. Cir. 2016).

First, continued enrollment in Medicare privileges is an established property interest. In *Arriva*, for example, the defendants (DHHS, the DHHS Secretary, and the Administrator for CMS) "concede[d] . . . that [a Medicare supplier] has a 'liberty or property' interest in its billing privileges, the deprivation of which would trigger due-process protections." 239 F. Supp. 3d at 285; *see also Robie*, 2017 WL 3188572, at *4 (holding as established that a Medicare provider's "expectation of continued participation in the Medicare program is a property interest protected by the due process clause of the Fifth Amendment" (quoting *Ram v. Heckler*, 792 F.2d 444, 447 (4th Cir. 1986))). J&B has a property interest in its continued enrollment in the Medicare program.

Second, as for the pre-revocation process "due," courts bear in mind that "[t]he essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991) (quoting *Mathews*, 424 U.S. at 348). "The notice provided must be 'reasonably certain to inform those affected,'. . . and the opportunity to be heard must be given 'at a *meaningful* time and in a meaningful manner.'" *Id.* at 1332 (emphasis added) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Due process requires that J&B has an opportunity to be heard "before [it] is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (footnote omitted). While a full evidentiary hearing is not always required prior to an adverse agency action, "some kind of hearing is necessary," which here has not happened in any way whatsoever. *Arriva*, 239 F.Supp.3d at 285 (cleaned up) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)).

The Supreme Court in *Mathews* articulated a three-factor balancing test for determining if sufficient process was given prior to the deprivation of a property interest. *Mathews*, 424 U.S. at 335. The Court must balance: (1) the private interest affected by the revocation; (2) the risk of an erroneous deprivation through the procedures used, and the probable value, if any, of additional or substitute procedural protections; and (3) the Defendants' interest, including the monetary and administrative burdens that the proposed additional or substitute procedural protection would create. *See id.*

A revocation of Medicare enrollment without *any* hearing necessarily violates the Due Process Clause. For example, in *Robie*, the district court found that the private-interest factor favored the plaintiff where "revocation of [his] Medicare billing privileges will gut his practice," cause him to lose several positions, and subject him to "permanent reputational harm." *Robie*, 2017 WL 3188572, at *5. Similarly, revoking J&B's Medicare enrollment will "gut" its business through the termination of it high-value and highly desired 746 Payor Contracts; prevention of service of any of its supplies, including its niche incontinence products; cessation of referrals, rebids, and pipeline opportunities; promulgation of irreversible reputational blight in the healthcare industry; and the termination of at least 400 (80%) of its employees. *See* **Ex. 2**, J. Shaya Decl., ¶¶ 19–29.

As for the erroneous-deprivation factor, the *Robie* court found that this factor weighed "heavily" in favor of the plaintiff where the plaintiff "received no *meaningful* communication regarding the reason for his revocation" after he responded to CMS's revocation letter because CMS had not presented any communication "explaining why the revocation was being upheld." *Id.* (emphasis added); *cf. Arriva*, 239 F.Supp.3d at 288 (holding that plaintiff did obtain an adequate hearing "when it received *a reconsideration decision . . . prior to* the revocation" (emphasis

added)).    Additionally, the court found that the notice was erroneous where CMS "failed to communicate the specific basis for the revocation." *Robie*, 2017 WL 3188572, at *6.  The court also noted that CMS did not afford the plaintiff any "in person opportunity to state their position," which "is a valuable procedural safeguard." *Id.*  Accordingly, because the plaintiff did not receive "any explanation for the revocation or any opportunity to be heard beyond a most conclusory statement that he failed to provide requested documents," the court held that such a "heavy handed and superficial bureaucratic pronouncement creates a substantial risk of erroneous deprivation."

Here, J&B provided to Chags a CAP and reconsideration request, but has not received any communication explaining if the revocation will be upheld and why.  Moreover, Novitas provided to J&B inadequate notice because it did not communicate the specific basis for revocation relative to finding (incorrectly) that J&B's facility "is not normally visited by beneficiaries."  (Compl., Ex. A, Revocation Letter at 2.)  Also, Novitas's failure to ask J&B any material questions or request any documents before, during, or after its two-hour, single-day visit on August 6, 2025, further demonstrates Defendants' disregard for adequate notice and hearing in this matter.

Last, for the Defendants'-interest factor, while Defendants may have an interest in ensuring compliance with the enrollment requirements to protect beneficiaries, J&B's basic request for notice and a hearing prior to revocation would not propose any new (or even a meaningful) burden on Defendants.  J&B is not aware of any beneficiary complaints relative to the alleged violations in the Revocation Letter and has only billed Medicare $5,799.53 over the course of nearly two years for the insulin pumps at issue in the Letter.

In short, all three *Mathews* factors weigh in favor of J&B's procedural-due-process claim, so J&B is likely to win on the merits.  Indeed, as in *Robie*, "due process is completely lacking in

this case." *Robie*, 2017 WL 3188572, at *7, 9 (granting preliminary injunction until the DHHS "Secretary demonstrates to the court that [plaintiff] has been afforded due process").

### B.    Irreparable Injury to J&B is Imminent

In determining whether enjoining the revocation would prevent irreparable harm, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough" when "adequate compensatory or other corrective relief will be available at a later date." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (citation omitted). To show irreparable harm, a plaintiff must demonstrate an injury that is "both certain and great . . . of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm" and that the injury be "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up). J&B meets the standard here.

Most importantly, a deprivation of due process under the U.S. Constitution "unquestionably" constitutes irreparable harm. *See Gordon v. Holder,* 826 F. Supp. 2d 279, 296 (D.D.C. 2011) ("In light of [plaintiff's] likelihood of success on his claim that the PACT Act's tax provisions violate due process, the Court finds that this potential deprivation of constitutional rights constitutes irreparable harm."); *Mills*, 571 F.3d at 1312 ("It has long been established that the loss of constitutional freedoms, '*for even minimal periods of time*, unquestionably constitutes irreparable injury.'" (emphasis added) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("Although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." (citation omitted).) Here, J&B's due-process deprivation is ongoing and will become irreversible in one week. *See* Section IV.A.2, *supra*. Irreparable harm is thus imminent.

But even beyond the looming deprivation of constitutional rights, additional irreparable harm is imminent: (1) loss of J&B's 746 Payor Contracts that are foundational to its business; (2) loss of at least 400 (80%) of its employees; (3) loss of its positive reputation; and (4) loss of vital medical therapies for vulnerable members across the entire United States.  Once such harms occur, they cannot be monetarily quantified.

First, injury to business relationships is an irreparable harm.  *See Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (finding irreparable harm where plaintiff's "customer list is the lifeblood of its business"); *see also Robie*, 2017 WL 3188572, at *7 (finding irreparable harm where plaintiff would lose contracts with insurance companies).  In *Robie*, the court found that "[t]here is no guarantee that [contracts and patients] will come back to Dr. Robie even if his billing privileges are reinstated.  Dr. Robie's practice likely will not be made whole through retroactive payments."  *Robie*, 2017 WL 3188572, at *7.  Here, a revocation triggers the cancelation of J&B's 746 Payor Contracts, which is the lifeblood of J&B.  **Ex. 2**, J. Shaya Decl., ¶ 14.  Like *Robie*, J&B will not be made whole through retroactive payments for the Payor Contracts because it will be "impossible" to renew all 746 contracts on like terms.  *Id.* ¶ 23.  Thus, the impending termination of J&B's Payor Contracts is a distinct, additional irreparable harm.

Second, "potential lay-offs of [plaintiff's] employees" constitutes irreparable harm.  *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1381 (Fed. Cir. 2006) (affirming preliminary injunction).  If revocation occurs, J&B will terminate at minimum 400 (80%) of it 500 employees, many of which have been with J&B for over five years.  **Ex. 2**, J. Shaya Decl., ¶ 29.  Such employees have institutional knowledge of J&B's business practices that cannot be quantified or duplicated.  *Id.*  By way of example, if J&B must terminate a 25-year employee that is intimately familiar with J&B's shipping process, that employee will quickly find new work.  While a new

employee hired after re-enrollment may be qualified for the job, the new hire will take years to operate as efficiently as the former, experienced employee. Consequently, the impending termination of at least 400 of 500 J&B employees will result in additional irreparable harm.

Third, reputational injury constitutes irreparable harm when it will damage a company's standing in its industry. *See Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) (finding irreparable harm where the imposition of a negative designation upon plaintiff by the U.S. Department of Defense would damage the plaintiff's "reputational standing with corporate customers and business partners" (citation omitted)); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (finding irreparable harm where defendant's revocation of a subcontract with plaintiff "left a black mark on [plaintiff's] reputation, irreparable absent an injunction, that will result in many lost contract opportunities" (collecting cases)); *Robie*, 2017 WL 3188572, at *8 (finding irreparable harm where revocation of Medicare enrollment "will create a permanent black mark on [plaintiff's] reputation"). Here, J&B likewise faces a "black mark" in the healthcare industry upon its Medicare enrollment revocation. Manufacturers who refer business to J&B will no longer do so if they believe J&B is not a Medicare supplier, and insurers will be unlikely to permit J&B back into their network for payor contracts if J&B's reputation has been tarnished as noncompliant with Medicare enrollment requirements. **Ex. 2**, J. Shaya Decl., ¶ 28. Such a reputational stain on J&B is therefore additional irreparable harm.

Last, courts also consider the interests of beneficiaries in analyzing irreparable harm. *See Mediplex of Mass., Inc. v. Shalala*, 39 F. Supp. 2d 88, 98–99 (D. Mass. 1 999) (interests of beneficiaries are "relevant in evaluating irreparable harm"); *see also Peak Med. Okla. No. 5, Inc. v. Sebelius*, No. 10-cv-5972010, WL 4809319, at *3 (N.D. Okla. Nov. 18, 2010) (same). Here, J&B's forced departure from supplying Medicare DMEPOS will negatively impact approximately

65,000 elderly, sick, and/or diabetic Medicare beneficiaries who rely exclusively on J&B for lifesaving equipment. If Defendants revoke J&B's enrollment, there is no one who could fully fill the gap in time to meet these beneficiaries' needs. Moreover, J&B is the exclusive contract supplier of incontinence products for Michigan and Wisconsin, which are vital for its beneficiaries. **Ex. 2**, J. Shaya Decl., ¶¶ 9–11, 21. In short, in the absence of injunctive relief, the revocation of J&B's Medicare supplier enrollment will deprive the Medicare program of the ability to provide essential supplies to tens of thousands of beneficiaries. This is yet another irreparable harm.

**C.     The Balance of Equities and Public Interest Factors Weigh in Favor of J&B**

While J&B faces irreparable harm for which there is no other effective remedy, granting injunctive relief will cause no appreciable harm to the government or to any other third party. And it will further the public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (merging "balance of equities" and "public interest" factors "when the Government is the opposing party"). In applying these factors, courts look at "the most serious possible injury" to the parties. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008).

When "the most serious possible injury" for the plaintiff is possible discontinuance of its business, but "the most serious possible injury" to CMS is "delay in revoking . . . Medicare billing privileges along with the financial burden of providing a modicum of additional procedure before such revocation takes effect," the balance weighs in favor of the plaintiff. *See Robie*, 2017 WL 3188572, at *8.

Like *Robie*, for J&B, "the most serious possible injury" is the complete loss of its 29-year business, whereas, for Defendants, "the most serious possible injury" is delay in revoking J&B's Medicare enrollment along with the financial burden of providing basic process of a notice and hearing before such revocation takes effect. J&B also faces a blatant violation of its Constitutional right to due process. Moreover, Defendants do not claim that J&B's supposed violations pose any

threat to public health or safety or that J&B is trying to defraud Medicare.  (*See* Compl., Ex. A, Revocation Letter.)

As for the public interest, "there is a strong public interest in meticulous compliance with the law by public officials."  *Fund for Animals, Inc. v. Espy*, 814 F. Supp. 142, 152 (D.D.C. 1993). The public needs to have confidence that our federal government will provide due process before effectively destroying a business.  No harm will come upon Defendants by enjoining revocation while the administrative process carries forth as designed; however, it is entirely inequitable for J&B to be upended with no particular benefit to Defendants and with no due process.

Additionally, when revoking Medicare enrollment results in a population losing access to proper medical care, then public interest weighs in favor of injunctive relief.  *See Robie*, 2017 WL 3188572, at *8 (finding that "preliminary relief is clearly in the public interest" where revocation of a doctor's Medicare billing privileges "will hinder the ability of West Virginians to receive necessary health care").  Similar to *Robie*, upending J&B's business will also result in upending therapies (some lifesaving) for tens of thousands of beneficiaries, including entire populations in Michigan and Wisconsin for whom J&B is the exclusive contract supplier of incontinence products.

In sum, J&B satisfies each element for this Court to issue a TRO and preliminary injunction.

## V.    CONCLUSION

Based upon the foregoing, J&B respectfully requests that this Honorable Court enter a TRO and preliminary injunction, to maintain the status quo of J&B's Medicare enrollment until Defendants afford to J&B its due process.

Respectfully submitted,

DICKINSON WRIGHT PLLC

Dated: September 10, 2025                    */s/ Gregory L. Ewing*
                                            Gregory L. Ewing (Bar No. 484684)
                                            International Square
                                            1825 Eye Street N.W., Suite 900
                                            Washington, D.C. 20006
                                            202-457-0160
                                            GEwing@dickinsonwright.com
                                            *Attorney for Plaintiff*